UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| SAMUEL HOWARD, | Case No. 2:93-cv-01209-LRH-VCF |
| Petitioner, | ORDER |
| v. | |
| WILLIAM GITTERE, *et al.*, | |
| Respondents. | |

On August 10, 2015, the Ninth Circuit granted petitioner Howard's motion for a limited remand for reconsideration of twenty-nine claims in light of the Supreme Court's decision in *Martinez v. Ryan*, 566 U.S. 1 (2012).[1] Having considered the briefing and exhibits submitted by the parties, the court concludes that Howard is not entitled to habeas relief on any of the twenty-nine claims.

I.    BACKGROUND

On May 6, 1983, pursuant to jury verdicts in the Eighth Judicial District Court of Nevada, Howard was convicted of murder in the first degree with use of a deadly weapon and was sentenced to death. He was also convicted of two counts of robbery with use of a deadly weapon in the same proceeding. In support of its death verdict, the jury found two aggravating

---

[1] The court of appeals ordered this court to also address Howard's motion for leave to file a fourth-amended petition to raise three additional claims. This court granted the motion in part, permitting Howard to raise claims based upon *Johnson v. Mississippi*, 486 U.S. 578 (1988) (Claim 16), and *Bouie v. City of Columbia*, 378 U.S. 347 (1964) (Claim 17), but denied inclusion of an ineffective assistance claim. ECF No. 320. The court subsequently determined that Claims 16 and 17 are barred by the doctrine of procedural default or, alternatively, they fail on the merits. ECF No. 369.

circumstances: (1) the murder was committed by a person who had been convicted of a prior violent felony; and (2) the murder was committed while the person was engaged in the commission of a robbery.

On December 28, 2009, this court entered a final order denying Howard's third amended petition for writ of habeas corpus in relation to the conviction and death sentence. Prior to that, the court had concluded that review of several of Howard's habeas claims, including numerous ineffective assistance of counsel claims, was barred by the doctrine of procedural default.

Howard appealed this court's final order. The Ninth Circuit Court of Appeals subsequently granted his motion to stay pending the outcome of his then-pending state habeas petition. During the stay, Howard filed the aforementioned motion for a limited remand.

II.    *MARTINEZ V. RYAN*

In *Martinez*, the U.S. Supreme Court held that ineffective assistance of post-conviction relief counsel may serve as cause to excuse a federal habeas petitioner's procedural default of an ineffective assistance of trial counsel claim. 566 U.S. 9, 17. The Ninth Circuit has explained the showing a petitioner must make to take advantage of *Martinez*:

> Where, as here, the state criminal justice system satisfies the characteristics required by *Martinez*, the petitioner must make two related showings about the strength of his particular IAC claim to excuse its default.

> First, the IAC claim must be "a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 132 S.Ct. at 1318. Thus, there must be a substantial showing of a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id*. at 695, 104 S.Ct. 2052.

> Second, a petitioner must show that "appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington*." *Martinez*, 132 S.Ct. at 1318. Construing *Martinez*, we have held that, to fulfill this requirement, a petitioner must show not only that PCR counsel performed deficiently, but also that this prejudiced the petitioner, i.e., that "there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different." *Pizzuto v. Ramirez*, 783 F.3d 1171, 1178 (9th Cir. 2015) (quoting *Clabourne v. Ryan*, 745 F.3d 362, 367 (9th Cir.),

*proceedings suspended and mandate stayed* (Apr. 2, 2014), *and overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798, 818 (9th Cir. 2015) (en banc)). Although the prejudice at issue is that in PCR proceedings, this is a recursive standard. It requires the reviewing court to assess trial counsel's as well as PCR counsel's performance. This is because, for us to find a reasonable probability that PCR counsel prejudiced a petitioner by failing to raise a trial-level IAC claim, we must also find a reasonable probability that the trial-level IAC claim would have succeeded had it been raised.

*Runningeagle v. Ryan*, 825 F.3d 970, 982 (9th Cir. 2016) (footnote omitted).

III.    THE TWENTY-NINE CLAIMS

These are the ineffective assistance of trial counsel (IATC) and appellate counsel (IAAC) claims the Ninth Circuit has directed this court to consider:

(1)    IATC for failure to conduct a meaningful mitigation investigation or present meaningful mitigation evidence.

(2)    IATC for failure to challenge the jury instruction on the degree of proof.

(3)    IATC for failure to challenge the jury instruction on Howard's mental state.

(4)    IATC for failure to challenge the jury instruction on premeditation.

(5)    IATC for failure to challenge the jury instruction limiting mitigation to "any other mitigating circumstance."

(6)    IATC for failure to challenge the trial court when it required a unanimous jury finding on mitigation.

(7)    IATC for failure to contact Howard's California defense attorney, who could have provided information germane to the Nevada case.

(8)    IATC for failure to obtain transcripts of Howard's California robbery trial.

(9)    IATC for failure to obtain medical records from Clark County Detention Center.

(10)   IATC for failure to request a competency hearing and otherwise pursue a finding of incompetency to stand trial.

(11)   IATC for failure to obtain a suppression hearing on Howard's in-custody statements to police officers.

(12)   IATC for failure to present a legal insanity defense.

(13)   IATC for failure to obtain Howard's visiting records at Clark County Detention Center.

(14)   IATC for failure to obtain the names of Howard's aunt and ex-girlfriend, who could have testified on his behalf at mitigation.

(15)   IATC for failure to obtain documentation of an inmate request to

3

correspond with Howard.

(16) IATC for failure to refute future dangerousness.

(17) IATC for improperly seeking a continuance.

(18) IAAC for failure to challenge the improper continuance.

(19) IAAC for failure to raise a claim based on the constructive denial of counsel at trial.

(20) IAAC for failure to challenge the jury instructions on reasonable doubt, lesser-included offense, and premeditation.

(21) IAAC for failure to challenge the jury instruction on the mental state required by the offense.

(22) IAAC for failure to challenge the jury instruction on first and second degree murder.

(23) IAAC for failure to challenge the instruction on malice and improper shifting of the burden of proof.

(24) IAAC for failure to challenge the jury instruction limiting mitigation to "any other mitigating circumstance."

(25) IAAC for failure to challenge the trial court's decision to require a unanimous jury finding on mitigation.

(26) IAAC for failure to challenge the improper lessening of the burden of proof at sentencing.

(27) IAAC for failure to raise cumulative error.

(28) IAAC for failure to challenge the arbitrary and capricious imposition of the death penalty.

(29) IAAC for failure to challenge cruel and unusual punishment by use of lethal injection.

ECF No. 313-1, p. 12-15.

## IV. ANALYSIS

Subsequent to the Ninth Circuit's issuance of a limited remand, the U.S. Supreme Court decided *Davila v. Davis*, 137 S. Ct. 2058 (2017), a case in which the Court expressly declined to extend the *Martinez* exception to allow federal courts to consider ineffective assistance of appellate counsel claims. *Id*. at 2063. Howard concedes that, because of *Davila*, his IAAC claims are no longer subject to review. ECF No. 385, p. 13.

///

4

With respect to his IATC claims, Howard has confined his argument on remand to certain claims. The court is left to assume that Howard views the remaining claims as lacking sufficient merit to warrant the court's consideration. Accordingly, the court addresses only the claims Howard supports with argument in his briefs on remand.

In addition, the court agrees with Howard's point in his reply brief that the court does not contemplate an additional round of briefing on the merits of any claims that may satisfy the *Martinez* test. See ECF No. 385, p. 11 ("[T]he Court did not call for bifurcated litigation, with one round of briefs on whether the procedural defaults can be excused and a second round on whether they are meritorious."). As the above-excerpt from *Runningeagle* makes clear, the determination whether Howard's defaults can be excused under *Martinez* cannot be divorced from the determination whether his remanded IAC claims succeed on the merits. Thus, the analysis below focuses primarily on whether Howard is entitled to habeas relief on any of his remanded claims without necessarily considering whether he can satisfy the *Martinez* test.

*IATC for failure to challenge jury instructions on premeditation and intent.*

Howard argues trial counsel provided ineffective assistance by neglecting to challenge incorrect jury instructions regarding the mental state required for first-degree murder in Nevada.

Prior to deliberating in the guilt phase of Howard's trial, the jury was instructed that "Murder of the First Degree is murder which is (a) perpetrated by any kind of willful, deliberate and premeditated killing, or (b) committed in the perpetration or attempted perpetration of robbery." ECF No. 338-12, p. 12. An additional instruction read as follows:

> Premeditation is a design, a determination to kill, distinctly formed in the mind at any moment before or at the time of the killing.
>
> Premeditation need not be for a day, an hour or even a minute. It may be as instantaneous as successive thoughts of the mind. For if the jury believes from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the premeditation is followed by the act constituting the killing, it is willful, deliberate and premeditated murder.

*Id.*, p. 13. The jury instructions did not include any additional definitions of willful, deliberate, or premeditated.

///

The Nevada statutes define first degree murder, in relevant part, as a "willful, deliberate and premeditated killing." Nev. Rev. Stat. § 200.030(1)(a). The use of the foregoing instruction was condoned by the Nevada Supreme Court in *Kazalyn v. State*, 825 P.2d 578 (Nev. 1992), and is commonly referred to as the *Kazalyn* instruction. Shortly thereafter, the Nevada Supreme Court confirmed "that the terms deliberate, premeditated and willful are a single phrase, meaning simply that the actor intended to commit the act and intended death to result." *Powell v. State*, 709, 838 P.2d 921, 927 (Nev. 1992). Eight years later, however, the Nevada Supreme Court ruled, in *Byford v. State*, 994 P.2d 700 (Nev. 2000), that the *Kazalyn* instruction was deficient because it defined only premeditation and failed to provide an independent definition for deliberation. *See Byford*, 994 P.2d at 713.

In *Polk v. Sandoval*, 503 F. 3d 903 (9th Cir. 2007), the court held that the *Kazalyn* instruction violates due process because it relieves the State "of its burden of proving every element of first-degree murder beyond a reasonable doubt." *Polk*, 503 F. 3d at 909. In *Babb v. Lozowsky*, 719 F.3d 1019 (9th Cir. 2013), however, the court determined that its holding in *Polk* regarding the constitutionality of the *Kazalyn* instruction was no longer good law in light of the intervening Nevada Supreme Court decision in *Nika v. State*, 198 P.3d 839 (Nev. 2008), which explained "that *Byford* represented a change in, rather than a clarification of, [Nevada] law." *Babb*, 719 F.3d at 1029. Thus, in cases in which the conviction was final prior to the *Byford* decision, due process did not require independent definitions for premeditation and deliberation because, prior to *Byford*, they were not separate elements of the *mens rea* necessary for first degree murder. *See id.*

In a more recent case, however, the Ninth Circuit determined that, prior to *Powell*, "deliberation was a discrete element of first-degree murder in Nevada." *Riley v. McDaniel*, 786 F.3d 719, 723 (9th Cir. 2015). Having so determined, the court held that the use of the *Kazalyn* instruction at Riley's trial in 1990 violated his right to due process under the United States Constitution. *Id.* at 724. Noting that his trial also occurred prior to *Powell*, Howard now relies on *Riley* to contend that his trial counsel were ineffective by allowing the use of jury instructions that failed to recognize deliberation as a discrete element of first-degree murder.

For reasons that follow, however, this court is not convinced that *Riley* compels a determination that Howard's counsel were ineffective. To begin with, the Ninth Circuit in *Riley* oversimplified the history of Nevada case law on the elements of first-degree murder. Under *Riley*, the history is cleanly divided in to three distinct periods with the elements of first-degree murder plainly established – (1) pre-*Powell*, when willfulness, deliberation, and premeditation were distinct elements to be proven beyond a reasonable doubt; (2) the period between *Powell* and *Byford*, when the three terms constituted "a single phrase, meaning simply that the actor intended to commit the act and intended death to result;" and (3) post-*Byford*, a return to pre-*Powell*. *See id*. at 723-24.

The question presented by *Strickland*'s performance prong is whether trial counsel performed below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 687-88. Trial counsel's performance must be evaluated based on the law and the "prevailing professional norms" as they existed at the time of defendant's trial. *Id*. at 690. The relevant inquiry, therefore, is whether, in 1983, Howard's trial counsel's representation "fell below an objective standard of reasonableness" when counsel permitted the trial court to use the *Kazalyn* instruction without insisting that the jury instructions distinctly define willfulness, deliberation, and premeditation. To answer this question, the court looks to the state of Nevada law at the time, not to the *Riley* decision issued more than 30 years after the fact. *See Sophanthavong v. Palmateer*, 378 F.3d 859, 870 (9th Cir.2004) (holding attorney was not required to accurately predict how courts would resolve question regarding sufficiency of evidence for conviction).

*Riley*'s pat analysis notwithstanding, the evolution of Nevada law on the meaning of "willful, deliberate, and premeditated" has been a 150-year process riddled with ambiguity and inconsistency. *See Nika*, 198 P.3d at 845-48 (tracing case law on terms from "the days of territorial law"); *see also Byford*, 994 P.2d at 713 (acknowledging "that the jurisprudence of this court on this issue has not been consistent"). *Riley* relies on *Hern v. State*, P.2d 278, 280 (Nev. 1981), (and cites in a footnote to a Nevada case from 1881) to establish the state of the law in Nevada prior to *Powell*. *Riley*, 786 F.3d at 723. The *Nika* court recognized, however, that "the *Hern* court did not specifically define 'premeditation' and 'deliberation'" and "when the *Hern*

court considered the sufficiency of the evidence that the victim's death was the result of a willful, deliberate, and premeditated act by the defendant, the court focused on the 'intent to kill' and 'premeditation,' without any discussion of 'deliberation' as a separate and distinct concept." *Nika*, 198 P.3d at 846.

And, while the court in *Riley* stated that "the Nevada Supreme Court changed its mind in *Powell*" (786 P.2d at 723), the court in *Powell* actually relied heavily on a case decided three years before *Hern* (and five years before Howard's trial) for its holding. See *Powell*, 838 P.2d at 926-27 (citing to *Briano v. State*, 581 P.2d 5 (Nev. 1978)). Specifically, the Nevada Supreme noted that, in *Briano*, it had "referred to 'deliberate and premeditated' as a single term and not separate elements requiring separate thought processes." *Id*. at 926. The court reaffirmed the following statement in *Briano*:

> "[T]he state must prove that a design to kill was distinctly and rationally formed in the mind of the perpetrator, at or before the time the fatal blows were struck.... [I]t [does not] matter how short a time existed between the formation of the design to kill and the killing itself."

*Id*. at 927. The court then concluded that "[a]s long as the instruction on premeditation which is given to the jury comports with *Briano*, it is not necessary to separately define deliberateness or willfulness." *Id*.

Making no reference to *Briano*, the Nevada Supreme Court in *Hern* cited only to the plain wording of the statute and a case from 1895 (*State v. Wong Fun*, 40 P. 95 (Nev. 1895)) for the proposition that "all three elements, willfulness, deliberation, and premeditation, must be proven beyond a reasonable doubt before an accused can be convicted of first degree murder." *Hern*, 635 P.2d at 280. The *Hern* court did not elaborate on the three elements and, as discussed above, focused primarily on premeditation as the distinguishing element between first-degree and second-degree murder. *See id*. at 280-81.

Under the circumstances, Howard's counsel had meager legal authority to insist that the jury instructions define deliberation as a distinct element that the jury must find beyond a reasonable doubt. Indeed, *Byford*, issued seventeen years later, was the first reported Nevada case to provide such a definition when it proclaimed that deliberation "connot[ed] a

dispassionate weighing process and consideration of consequences before acting." *Byford*, 994 P.2d at 714. Having no Nevada precedent to rely upon, the *Byford* court relied upon a Tennessee case and a criminal law hornbook to conclude that a deliberate killing involves "coolness and reflection." *Id.* (citing *State v. Brown,* 836 S.W.2d 530, 539 (Tenn. 1992) and Wayne R. LaFave & Austin W. Scott, Jr., Criminal Law § 7.7, at 643 (2d ed. 1986)).

And, given the foregoing, it is not surprising that, in a more recent case, the Nevada Supreme Court stated that it "did not agree with *Riley*" and cited to its decision in *Nika* where it recounted the history of Nevada law on the phrase "willful, deliberate, and premeditated," including *Hern*, and explained that, prior to *Byford*, the court did not require separate definitions of the terms. *See Leavitt v. State*, 386 P.3d 620, 620–21 (Nev. 2016).

In summary, Howard's trial counsel had no basis upon which to challenge the *Kazalyn* instruction as it represented a correct statement of the law at the time of Howard's trial. Counsel's failure to anticipate a change in the law does not constitute ineffective assistance of counsel even if the theory upon which the court's later decision is based is available. *See Pinkston v. Foster*, 506 F. App'x 539, 542 (9th Cir. 2013) ("It was not deficient performance for [] appellate counsel not to argue what was, at the time, a losing proposition.").

Having concluded that Howard cannot meet the performance prong, the court is not required to address *Strickland*'s prejudice prong. *See Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim … to address both components of the inquiry if the defendant makes an insufficient showing on one."). The court nonetheless briefly notes the following distinctions between this case and *Riley*, where the court concluded that use of the *Kazalyn* instruction was not harmless error under *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). *See Riley*, 786 F.3d at 727.

First, the prejudice standard under *Strickland* is more difficult to meet than the *Brecht* harmless error standard. *See Kyles v. Whitley*, 514 U.S. 419, 436 (1995) (*Strickland* prejudice standard requires greater showing of harm to petitioner than *Brecht*'s harmless-error standard); *Pirtle v. Morgan*, 313 F.3d 1160, 1173 n.8 (9th Cir. 2002) ("[H]armless error analysis under *Brecht* ... involves a lower standard than *Strickland*'s standard for prejudice."(citing *Kyles*)).

Second, evidence presented at Riley's trial established that Riley was "very upset" when he shot and killed his victim and had just smoked crack. *Riley*, 786 F.3d at 725. Here, Howard alleges he suffered from Post-Traumatic Stress Disorder (PTSD), but the record does not establish his specific mental state at the time of the murder in the same manner as in *Riley*. Third, there was evidence presented that Howard's victim was shot in the back of the head while lying face down in the back of his van, suggesting an execution-style killing. ECF No. 338-2, pp. 29-34 and 49-50; ECF No. 338-3, pp. 21-26, 63-64. Thus, the State had a stronger case for deliberation than in *Riley*. *See Riley*, 786 F.3d at 725-26. And, even absent sufficient evidence to prove deliberation (as the term was later defined in *Byford*), the State proved and the jury found (or would have found) Howard guilty of first-degree murder under the felony-murder rule – i.e., the murder was committed in perpetration of a robbery.[2]

Based on the foregoing, Howard's claim of ineffective assistance based allegations that trial counsel failed to challenge the *Kazalyn* instruction lacks merit.

> *IATC for failure to contact Howard's California defense attorney and to adequately argue Howard was incompetent to stand trial.*

Until his reply brief on remand, Howard argued trial counsel provided ineffective assistance by failing to contact Charles Nacsin, Howard's attorney in a San Bernardino County, California, robbery case in which Howard was committed to mental health facilities for a significant period of time before being found competent to stand trial. Howard asserted that Nacsin could have provided information to use in arguing his incompetency in his Nevada case. In his reply brief, however, Howard states that, in preparing the reply brief, he "discovered documentation suggesting that trial counsel did in fact communicate with Mr. Nacsin and acquire some of his records." ECF No. 385, p. 55. Accordingly, Howard now modifies this claim to

---

[2] Relying on *Babb*, the court in *Riley* found no prejudice under such a theory because it had "no reason to believe that the jury in fact decided to convict Riley based on a felony-murder theory rather than on the more traditional first-degree murder charge." *Riley*, 786 F.3d at 727. Again, the prejudice inquiry under *Strickland* is different with the petitioner required to show that, but for trial counsel's error, there is a reasonable probability that the outcome of the would have been different. *Strickland*, 466 U.S. at 694.

allege that "trial counsel failed to properly *use* and follow up on information they obtained from Mr. Nacsin." *Id*., p. 56 (emphasis in original).

This claim fails because Howard is unable to establish any prejudice arising from counsel's allegedly deficient performance. Prior to modifying his claim, Howard argued that "[h]ad trial counsel discovered that Mr. Howard was deemed incompetent to stand trial in California, there is a reasonable probability that he would also have been found incompetent to stand trial in Nevada." ECF No. 376, p. 83. It is clear now, however, that trial counsel were aware of that fact at least two months prior to Howard's trial. ECF No. 386-5, p. 2. Howard's prejudice argument is premised on little more than an assertion that, because he was deemed incompetent for a period of time in California, there is a reasonable probability that the Nevada court would have also made such a finding had trial counsel pressed the issue. ECF No. 376, p. 83-84.

In April 1980, citing Howard's suicide attempt in jail and his behavior at his arraignment, the municipal court for San Bernardino County committed him to a county hospital. ECF No. 291-7, p. 2-3. In July 1980, he was transferred to Patton State Hospital, where he stayed for five months and then to Atascadero State Hospital, where he stayed for four months. ECF No. 291-8, p. 74-75. In May 1981, Howard was discharged back to the county jail having been found competent to stand trial. ECF No. 291-6, p 120. Howard was tried and convicted for the California robbery in April 1982. *Id*., p. 72. He remained incarcerated in California until November 1982 when he was returned to Nevada to stand trial in this case. ECF No. 336-9, p. 3.

In its order denying Howard's third amended petition, this court addressed the medical records generated by the mental health facilities in California and San Bernardino County:

> [T]he records from Patton, Atascadero, and San Bernardino County, reveal very scant reliable information about Howard's background, and indicate that, while Howard was diagnosed with various mental impairments, several specialists suspected that Howard was malingering. Docket #291, exhibits 62, 63, 65, 67.
>
> After being committed to the county hospital in San Bernardino, Howard was evaluated by two court-appointed psychiatrists (Dr. Oshrin and Dr. Gericke) and one court-appointed psychologist (Dr. Soltz). All three specialists advised the court that Howard was incompetent at the time, but each of them noted Howard's evasiveness and refrained from trying to pinpoint his actual impairment. *Id*., exhibit 63. Oshrin summarized his impressions as follows:

> Because of the many different opinions and ways in which this man presents himself, I am unable to come to a solid or firm opinion. Frankly I am uncertain if this man is feigning mental illness for purpose of eluding litigation or whether he is mentally ill with the superimposition of other factors.

*Id.*, p. 12. Gericke noted that "[i]nasmuch as he is unable to give any information at this time, any opinion as to his mental condition at the time of the alleged crime cannot be formulated." *Id.*, p. 15. Soltz felt with Howard there was "certainly a possibility of some malingering here as well as obvious evidence of mental disorganization." *Id.*, p. 19.

> Evaluations conducted by a psychologist (Dr. Sutton) and psychiatrist (Dr. Clark) a few months later while Howard was at Patton both resulted in a diagnosis of "Organic Brain Syndrome: atypical due to drugs." *Id.*, p. 34, 37. Upon being transferred to Atascadero, however, the staff, after reviewing his past records and again after observing him for a couple of weeks, concluded that his diagnoses were malingering and an antisocial behavior disorder. Docket #291, exhibit 62, p. 29, 35. The same diagnoses were repeated in Howard's discharge summary from Atascadero, which included the following notation:

> His apparent apathy with regard to his future was not seen as related to any mental illness, and it was felt that if the patient does not cooperate in court, it most definitely would be by his own choice. Although questions of possible organic brain damage arose in Mr. Howard's treatment, prior records and examination here showed no evidence of organicity. Patient refused psychological testing.

*Id.*, p. 120. In fact, the only report among the Atascadero records that even hinted at significant mental impairment is an evaluation from one psychiatrist, Dr. Van Putten, who opined that Howard suffered from a "schizophrenic-type illness." *Id.*, p. 31.

ECF No. 294, p. 23-24.

Beyond the foregoing, Howard points to no evidence establishing that his mental condition had worsened between May 1981, when he was determined competent to stand trial in California, and April 1983, when he was tried and convicted in Nevada. In January 1983, the trial judge rejected the suggestion that Howard might be incompetent, noting that, based on his (the judge's) observations that Howard was "very knowledgeable about his situation and the problems he's getting into" and was "aware of what he's charged with and the circumstances." ECF No. 336-25, p. 15. The judge made similar observations during the penalty phase of Howard's trial. ECF No. 338-15, p. 11. *See Dusky v. United States*, 362 U.S. 402 (1960) (holding that a person is competent to stand trial if he understands the proceedings and is able to assist

counsel in his defense).[3] Because there is not a reasonable probability that he would have been found incompetent by the Nevada trial court, Howard was not prejudiced by his trial counsel's conduct and this claim must be denied. *See Hoffman v. Arave*, 455 F.3d 926, 938 (9th Cir. 2006), *vacated on other grounds*, 552 U.S. 117 (2008) (denying *Strickland* claim because evidence did not show a reasonable probability the trial court would have found defendant incompetent to stand trial).

*IATC for improperly seeking a continuance.*

Howard argues trial counsel provided ineffective assistance by obtaining a continuance of Howard's trial against Howard's wishes. According to Howard, the continuance allowed the State to assemble and present damaging fingerprint evidence, which would not have occurred had the trial proceeded on schedule. The evidence included testimony that a latent thumbprint found on the cargo door handle of the victim's van matched an exemplar print taken from Howard.

This claim is plainly meritless. Even without the fingerprint evidence, the evidence establishing Howard's guilt with respect to the murder was overwhelming. Evidence presented at trial established the following.[4] On the day the victim was murdered, Howard met with him at his dental office at 7 a.m., ostensibly to test-drive his (the victim's) van. Less than an hour later, the van was spotted in the parking lot of a tavern. (That evening, the victim's body was discovered in the back of the van, which was still parked in the same spot.) Forty-five minutes after being dropped off by his girlfriend that morning, Howard returned to their motel room (across the street from the tavern) carrying a C.B radio and wearing a gold Seiko watch that she had not seen him wearing before. And, later that day, Howard's girlfriend saw that he had a wallet with family pictures. A C.B. radio was missing from the victim's van and, based on the

---

[3] The court is aware that Howard's demeanor during court proceedings cannot be relied upon to "dispense with a hearing on that very issue." *Pate v. Robinson*, 383, 386 (1966). It is nonetheless relevant with respect to this court's prejudice inquiry, especially given that Howard thwarted counsel's efforts to obtain his medical records or have him evaluated. ECF No. 338-15, p. 7-9.

[4] The transcript of the guilt phase of Howard's trial is located at ECF Nos. 337-22, 337-24, 337-25, 338-2 through 6, 338-10 and 338-27. The transcript for proceedings on April 12, 1983, (ECF No. 337-24) is incomplete, but a complete transcript for that day is located at ECF No. 38-4.

victim's wife's testimony, the wallet and watch matched the descriptions of items belonging to the victim.

The fingerprint evidence played such a minor role in the State's case that the prosecutor did not even mention it in his initial closing argument. ECF No. 338-27, p. 59-100. It was only after Howard's counsel challenged the evidence in his closing remarks that the prosecutor discussed it in rebuttal. *Id.*, p. 125-26.

Because there is no reasonable probability the outcome of Howard's trial would have been different if trial counsel had not obtained a continuance, this claim fails.

> *IATC for failure to conduct a meaningful mitigation investigation and present adequate mitigating evidence.*

Howard argues trial counsel provided ineffective assistance by failing to compile and present mitigating evidence at the penalty phase of his trial. Among the claims this court determined to be procedurally defaulted prior to the Ninth Circuit's remand was a claim that trial counsel failed to adequately investigate Howard's background and present certain information about his past (i.e., the claim set forth in section 22 of Claim Seventeen of Howard's third amended petition (ECF No. 189)). Even so, this court recounted much of that same information in addressing related penalty-phase IATC claims in its final order denying Howard's third amended petition:

> Howard argues that counsel's deficient performance precluded the jury from learning about his "tragic life," an account of which is contained in his traverse. Docket #280, p. 22-70. According to that account, Howard, who is Black, spent his early childhood in racially-segregated Alabama. His father was a violent drunk who shot and killed Howard's mother and infant sister when Howard was three years old. Howard and his surviving sister were moved in to the affectionless, poverty-stricken household of a couple in their 70s, where they were emotionally abused by the wife. Unable to find a suitable foster placement for Howard, the Alabama Department of Human Resources committed him to the Alabama Industrial School for Negro Children (also known as Mt. Meigs) when he was twelve years old.

> While providing very scant information about Howard's own experiences at Mt. Meigs, Howard's traverse contains a lengthy description of the abject conditions and atrocities that purportedly plagued the school during the early 1960s, when Howard spent two and a half years there. According to the traverse, Mt. Meigs was essentially a slave labor camp for juveniles, where the students were provided woefully inadequate food, clothes, shelter, and schooling. Forced to work daily in the fields under extremely harsh conditions and allowed to attend school for only half the day, if at all, the inmates were routinely subjected to physical and sexual abuse from their overseers, as well as their peers. Howard's

traverse also speculates that he may have been exposed to highly toxic pesticides during his time at Mt. Meigs, the effect of which was to damage a region of the brain that controls one's conduct.

After spending a tumultuous year with his father, who had been released on parole, Howard, then sixteen years old, was taken in by an aunt who lived in New York City. Howard's traverse goes to great lengths to describe the adverse conditions (violent crime and poverty) present in the neighborhood in which Howard lived (i.e., the Bedford-Stuyvesant section of Brooklyn) upon his arrival in New York, but (as with the description of Mt. Meigs) includes very little information about Howard's personal experience.

Howard enlisted in the Marine Corps at the age of nineteen. He spent thirteen months deployed with a mine-sweeping team in the vicinity of Danang during the Viet Nam War. According to his traverse, Howard's personality and behavior had changed when he returned to New York from Viet Nam. Among other irregularities, he was "more erratic and aggressive," quick to anger, and prone to drifting off as if in a trance. In addition, he seemed to be self-medicating by drinking beer and smoking "a lot of marijuana." His emotional state appeared to deteriorate throughout the late 1970s and into the early 1980s, a period in which his criminal activity became more pronounced and serious.

Lastly, Howard posits in his traverse that much of his behavior could be attributed to posttraumatic stress disorder (PTSD) and an accompanying psychotic disorder, a diagnosis that should have been, but never was, considered when he was evaluated at Patton and Atascadero, as well as in other court-ordered evaluations.

ECF No. 294, p. 19-21.

In denying relief, this court found, based on the state court record, that Howard had impeded counsel's efforts to obtain mitigating information by refusing to sign releases, to answer counsel's questions, and to cooperate with a court-appointed psychiatrist. *Id.*, p. 16-23. The court also found that Howard had also insisted that his trial not be delayed and would not consent to counsel presenting mitigation evidence on his behalf. *Id.* Based on that, the court concluded that Howard's ability to show prejudice was limited by the holding in *Schriro v. Landrigan*, 550 U.S. 465 (2007), "that it was not objectively unreasonable for the Arizona court to conclude 'that a defendant who refused to allow the presentation of any mitigating evidence could not establish *Strickland* prejudice based on his counsel's failure to investigate further possible mitigating evidence.'" *Id.* (quoting *Landrigan*, 550 U.S. at 478).

This court also considered the proffered mitigation evidence allegedly omitted by counsel and determined that, when viewed objectively, it failed to establish a reasonable probability of a different outcome. *Id.*, p. 23-28. Among other things, the court noted that the records from

Patton, Atascadero, and San Bernardino County "indicate that, while Howard was diagnosed with various mental impairments, several specialists suspected that Howard was malingering." *Id*., p. 23-24. The court also noted that the allegations regarding Howard's attendance at Mt. Meigs, his teenage years in New York, and service in Vietnam were not substantiated with evidence of Howard's *personal* experiences. *Id*., p. 25. And, with respect to Vietnam, the available records appeared to discredit Howard's version of his Vietnam experience, as related in his penalty phase testimony. *Id*., p. 26.

Now, on remand, Howard has proffered "new evidence" that, according to him, strengthens his case for mitigation. ECF No. 376, p. 134-41. This evidence includes declarations from two men who attended Mt. Meigs during the same time period as Howard (ECF Nos. 377-43 and 377-45), a video in which former Mt. Meigs attendees talk about their experiences at the school (ECF No. 378), a declaration from a soldier who was in the same Marine unit as Howard in Vietnam (ECF No. 377-46), records showing that the Department of Veteran Affairs determined in 2012 that Howard suffers from PTSD connected to his service (ECF No. 377-47), and a "new psychological report" completed in 2017 (ECF No. 377-6). In addition, Howard obtained, subsequent to his opening brief on remand but prior to his reply, a declaration from a man whose family owned a clothing store that hired Howard as an employee in 1969. ECF No. 386-6.

Even with this new evidence, this court remains unpersuaded that counsel were ineffective in failing to assemble and present mitigating evidence. Howard's trial was scheduled to begin in January 1983. In seeking a continuance just prior to the scheduled date, counsel outlined for the trial court the evidentiary leads they wished to pursue if given more time. ECF No. 336-25, p. 6-9. These included information regarding Howard's hospitalization at various mental institutions, his confinement in the "psychotic unit" at Vacaville State Prison, his history of drug abuse, diagnoses of schizophrenia and hypothyroidism, complaints of head injuries and severe headaches, and at least one prior suicide attempt (as well as mentioning a desire to commit suicide). *Id*. Counsel also noted their attempt to have Howard evaluated by a psychiatrist had been frustrated by Howard's refusal to cooperate. *Id*.

After a brief recess of the hearing to allow counsel to consult with Howard, counsel notified the court that Howard did not want the trial delayed. ECF No. 337-1, p. 3. The court indicated that Howard's desire to start the trial would be honored, but continued the matter until the afternoon, thereby allowing counsel an opportunity to further consult with Howard. *Id.* When the court reconvened, counsel informed the court that Howard had not changed his mind about going forward with the trial but stated that they (counsel) were not prepared to do so. *Id.*, p. 5. Counsel argued that, under Nevada law, a continuance of 60 days would not violate the speedy trial rule. *Id.* The court continued the trial to April 1983. *Id.*, p. 13.

Howard's trial began on April 11, 1983. Prior to the commencement of jury selection, trial counsel advised the court that the lack of communication between Howard and counsel that existed at the "inception of our relationship way back in November of 1982" had persisted to that day. ECF No. 337-22, p. 7. On May 2, 1983, the first day of Howard's penalty hearing, trial counsel renewed their motion to withdraw as Howard's counsel. ECF No. 338-15, p. 6-8. Counsel explained to the court that Howard would not consent to them presenting mitigating evidence they had uncovered, would not sign any medical releases to allow them to develop additional information, and did not want them to make argument in support of mitigation. *Id.* Counsel suggested that new counsel might be more successful in persuading Howard to do what they thought was in his best interest. *Id.* Counsel also gave examples of some of the information they uncovered, which included information that Howard's father killed his mother and sister in his presence, that Howard had been declared incompetent some time after his arrest in April 1980, that Howard had been a patient in a mental health facility subsequent to his arrest, that Howard had asked to see a psychiatrist when a police detective interviewed him after his arrest, and that Howard speculated that his conduct might be attributable to witnessing his father kill his mother and sister and also to his experiences in Vietnam. *Id.*

Howard confirmed to the court his counsel's statement that he would not consent to the presentation of mitigating evidence:

> Howard:       Well, basically what [counsel] said is true. We had differences starting back in November. And I'd rather not for them to enter any mitigating factors on my behalf.

17

| Court: | All right. You are aware of the fact that those mitigating factors may possibly be of assistance to you in this matter? |
| --- | --- |
| Howard: | Yes. I'm aware, your Honor. |
| Court: | And being fully aware of that, you still don't desire that they present those; is that correct? |
| Howard: | Exactly. |

*Id.*, p. 9.

Opining it was Howard's decision, not counsel's, as to whether to present mitigating evidence, the court denied counsel's motion to withdraw. *Id.*, p. 13. Also, the court noted that counsel had provided Howard with "competent and able representation in these proceedings." *Id.*, p. 12.

Based on the foregoing, this court again concludes that the facts of this case are solidly aligned with those in *Landrigan*, where the court recognized that a defendant's interference with counsel's penalty phase investigation and refusal to allow the presentation of mitigating evidence can preclude a showing of *Strickland* prejudice. *See Landrigan*, 550 U.S. at 478. As in *Landrigan*, Howard did not merely refuse to cooperate with counsel, he actively obstructed their efforts to present mitigating evidence. *Cf. Porter v. McCollum*, 558 U.S. 30, 40 (2009) ("Porter may have been fatalistic or uncooperative, but that does not obviate the need for defense counsel to conduct *some* sort of mitigation investigation." (emphasis in original)); s*ee Hamilton v. Ayers*, 583 F.3d 1100, 1119 (9th Cir. 2009) (distinguishing facts in *Landrigan* from case in which defendant "refused to assist in his defense" but "did not impede the many other avenues of mitigating evidence available to counsel").

In addition, this court rejects the notion that *Landrigan* does not apply here because it is a post-AEDPA case. Howard cites to no controlling authority that *Landrigan*'s prejudice holding is limited to AEDPA's deferential review. He cites to *Hardwick v. Sec'y, Fla. Dep't of Corr.*, 803 F.3d 541 (11th Cir. 2015), to support his position that *Landrigan* does not apply to pre-AEDPA cases but the court in that case made no such holding and instead concluded *Landgrigan* was distinguishable on the *facts*, as found by the district court. 803 F.3d at 563.

Finally, with the time constraints trial counsel faced, this court again notes the irony of Howard faulting trial counsel for not assembling the mitigating evidence upon which he now relies to demonstrate prejudice. As noted in the order denying Howard's third amended petition, much of this "allegedly 'available' or 'undiscovered mitigation evidence' … was not compiled or presented to any court until more than twenty years after Howard's trial." ECF No. 294, p. 25. Indeed, the declaration from the man whose family owned a clothing store that hired Howard as an employee in 1969 was executed in August 2017, more than 23 years after Howard initiated this federal proceeding. ECF No. 386-6.

Because Howard cannot establish that he was prejudiced by counsel's alleged failure to conduct an adequate mitigation investigation and present available mitigation evidence, his claim fails.

*IATC for failure to support an instruction that the murder was committed while Howard was under the influence of an extreme mental and emotional disturbance.*

Howard argues trial counsel provided ineffective assistance of counsel by failing to present evidence to support their proffered jury instruction referencing the statutory mitigating circumstance that the "murder was committed while the defendant was under the influence of an extreme mental or emotional disturbance." See Nev. Rev. Stat. § 200.035(2). In making this argument, Howard has taken the liberty of modifying the claim contained in his amended petition and remanded by the Ninth Circuit. That claim faulted trial counsel's alleged failure to challenge the jury instruction limiting mitigation to "any other mitigating circumstance." ECF No. 313-1, p. 13; ECF No. 321, p. 39.

The problem with the original claim is that counsel did, in fact, challenge the relevant jury instruction – Instruction 12 (ECF No. 338-19, p. 13). ECF No. 338, p. 55-62. Even as modified, however, the claim lacks merit. Howard argues that there was evidence available to demonstrate that he was afflicted with PTSD at the time of the crime. Be that as it may, there is no evidence that any manifestations of the disorder played a role in the murder. *See Gutierrez v. State*, 920 P.2d 987, 990 (Nev. 1996) (sentencing panel's rejection of extreme mental or emotional disturbance mitigator was not error where, despite evidence of defendant's delusional beliefs about his victim (his step-daughter), there was no evidence connecting such beliefs to her

murder); *Baal v. State*, 787 P.2d 391, 395 (Nev. 1990) (evidence of defendant's personality disorder not sufficient to demonstrate extreme mental or emotional disturbance at the time of the crime). And, as discussed above, Howard thwarted counsel's attempts to develop mental health evidence on his behalf.

For these reasons, the record does not support Howard's claim that trial counsel were ineffective by not presenting evidence to support an instruction that the murder was committed while he was under the influence of an extreme mental and emotional disturbance.

*IATC for failure to challenge the jury unanimity requirement on mitigation.*

Howard argues trial counsel provided ineffective assistance of counsel by failing to challenge jury instructions that, according to Howard, "strongly suggested" the jury needed to unanimously agree on mitigating evidence in order to enter a non-death penalty verdict.

Here are the relevant instructions:

> Instruction Six -- The defendant has alleged that certain mitigating circumstances are present in this case. It shall be your duty to determine:
>
> (a) Whether an aggravating circumstance or circumstances are found to exist;
>
> (b) Whether a mitigating circumstance or circumstances are found to exist; and
>
> (c) Based upon these findings, whether the defendant should be sentenced to life imprisonment or death.
>
> The jury may impose a sentence of death only if it finds at least one aggravating circumstance has been established beyond a reasonable doubt and further finds that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found.
>
> Otherwise, the punishment imposed shall be imprisonment in the State Prison for life with or without the possibility of parole.

ECF No. 338-19, p. 7.

> Instruction Sixteen -- The Court has submitted two sets of verdicts to you. One set of verdicts reflects the three possible punishments which may be imposed. The other set of verdicts are special verdicts. They are to reflect your findings with respect to the presence or absence and weight to be given any aggravating circumstance and any mitigating circumstances.

///

It will be the jury's duty to select one appropriate verdict pertaining to the punishment which is to be imposed and one appropriate special verdict pertaining to the jury's findings with respect to aggravating and mitigating circumstances.

*Id.*, p. 17.

Instruction 17 (the final instruction) -- During your deliberation you will have all the exhibits which were admitted into evidence, these written instruction, and forms of verdict which have been prepared for your convenience.

Your verdicts must be unanimous. When you have agreed upon your verdicts, they should be signed and dated by your foreman.

*Id.*, p. 18.

Here is the special verdict form provided to the jury:

We, the jury …, having found the Defendant … GUILTY of Murder in the First Degree, designate that the aggravating circumstances or circumstance checked below have been established beyond a reasonable doubt.

☐ The murder was committed by a defendant who was previously convicted of a felony involving the use or threat of violence to the person of another.

☐ The murder was committed while the defendant was engaged in the commission of any robbery.

We, the Jury, state there are no mitigating circumstance or circumstances sufficient to outweigh the aggravating circumstance or circumstances designated.

ECF No. 338-22, p. 2.

Howard argues that these instructions, together with the special verdict form, were misleading in the same manner as the instructions and verdict form in *Mills v. Maryland*, 486 U.S. 367 (1988). The Supreme Court in *Mills* vacated the petitioner's death sentence after "conclud[ing] that there is a substantial probability that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." *Mills*, 486 U.S. at 384.

The Supreme Court in a subsequent case explained the offending instructions and verdict form in *Mills* as follows:

In the *Mills* sentencing phase, the trial judge instructed the jury to fill out a verdict form that had three distinct parts. Section I set forth a list of 10 specific

aggravating circumstances next to which were spaces where the jury was to mark "yes" or "no." Just above the list, the form said:

> "Based upon the evidence we *unanimously* find that each of the following aggravating circumstances which is marked 'yes' has been proven ... and each aggravating circumstance which is marked 'no' has not been proven ...." *Id.*, at 384–385 [, 108 S.Ct. 1860] (emphasis added; internal quotation marks omitted).

Section II set forth a list of eight potentially mitigating circumstances (seven specific circumstances and the eighth designated as "other") next to which were spaces where the jury was to mark "yes" or "no." Just above the list the form said:

> "Based upon the evidence we *unanimously* find that each of the following mitigating circumstances which is marked 'yes' has been proven to exist ... and each mitigating circumstance marked 'no' has not been proven ...." *Id.,* at 387 [, 108 S.Ct. 1860] (emphasis added; internal quotation marks omitted).

Section III set forth the overall balancing question, along with spaces for the jury to mark "yes" or "no." It said:

> "Based on the evidence we *unanimously* find that it has been proven ... that the mitigating circumstances marked 'yes' in Section II outweigh the aggravating circumstances marked 'yes' in Section I." *Id.,* at 388–389 [, 108 S.Ct. 1860] (emphasis added; internal quotation marks omitted).

Explaining the forms, the judge instructed the jury with an example. He told the jury that it should mark "'yes'" on the jury form if it "'unanimously'" concluded that an aggravating circumstance had been proved. *Id.,* at 378, 108 S.Ct. 1860. Otherwise, he said, "'of course you must answer no.'" *Ibid.* (emphasis deleted). These instructions, together with the forms, told the jury to mark "yes" on Section II's list of mitigating factors only if the jury unanimously concluded that the particular mitigating factor had been proved, and to consider in its weighing analysis in Section III only those mitigating factors marked "yes" in Section II. Thus, as this Court found, the jury was instructed that it could consider in the ultimate weighing of the aggravating and mitigating evidence only the mitigating factors that the jury had *unanimously* found to exist. See *id.,* at 380–381, 108 S.Ct. 1860.

*Smith v. Spisak*, 558 U.S. 139, 145–46 (2010)

As one can readily see, the relevant instructions and verdict form provided Howard's jury bear faint resemblance to those in *Mills*. Nowhere did they say or imply that the jury must determine the existence of a mitigating factor unanimously. A unanimity requirement was imposed only as to the verdict, which in this case correctly required the jury to unanimously find the following before imposing the death penalty: (1) that one or both aggravating circumstances had been established beyond a reasonable doubt, (2) that any mitigating circumstances were not

22

sufficient to outweigh the aggravating circumstance(s) that had been established, and (3) that the sentence to be imposed was death. In summary, there is not a "substantial possibility" that reasonable jurors would have construed the instructions and form to preclude them from considering any mitigating evidence unless they *all* agreed on the existence of a mitigating circumstance. *See Mills*, 486 U.S. at 384. Accordingly, Howard's trial counsel did not provide ineffective assistance by failing to challenge the instructions.

       *IATC for failure to refute future dangerousness*.

       Howard argues trial counsel provided ineffective assistance of counsel by not rebutting the State's argument at sentencing that Howard presented a future danger to the community. He cites to several remarks by the prosecutor in his penalty-phase closing arguments indicating the death penalty was necessary to protect the community from Howard. ECF No. 376, p. 168-69. He faults trial counsel for not objecting to improper comments, not addressing the issue in closing argument, and not presenting evidence to demonstrate he would not present a future danger. *Id*., p. 169-73. Specifically, he claims counsel should have (1) presented evidence that prisoners become less violent as they age, (2) alerted the jury that Howard's future dangerousness should be assessed in the context of the prison setting where he would likely spend the rest of his life, and (3) presented evidence of Howard's history of non-violence while in confinement. Id., p. 171-73.

       Here again, Howard has altered the claim contained in his amended petition and remanded by the Ninth Circuit. That claim faulted trial counsel's alleged failure "to refute the prosecution's argument regarding future dangerousness by failing to call jail personnel and fellow inmates as well as to psychiatrically document and present psychiatric testimony that Mr. Howard was not a threat to the jail population if granted life imprisonment by the jury." ECF No. 313-1, p. 14; ECF No. 321, p. 39.

       Even in its modified form, this IATC claim lacks merit. With respect to counsel's failure to object to improper comments, this court already addressed and denied such a claim in its final order denying Howard's third amended petition. ECF No. 294, pp. 6-10, 27. In addition, trial

counsel did not, as Howard alleges, completely fail to address the prosecutor's remarks suggesting Howard was a threat to the community. ECF No. 338-21.[5]

As for counsel's failure to present evidence, generalized evidence about aging prisoners and the security measures in place for death row prisoners would have been of questionable relevance. *See United States v. Taylor*, 583 F Supp.2d. 923, 936–38 (E.D. Tenn. 2008) (excluding evidence of prison security to rebut allegations of future dangerousness that related solely to conduct occurring outside of prison). With respect to Howard's history of non-violence in confinement, the only specific evidence Howard cites – i.e., the records regarding his stays in mental health facilities – was among the evidence Howard hindered counsel from obtaining. In addition, Howard does not proffer any evidence as to the specific testimony jail personnel, fellow prisoners, or a psychiatrist might have been able to provide. *See Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000) (denying ineffective assistance of counsel claim based on lack of preparation for failure to call witnesses when no affidavits were submitted to support petitioner's assertion as to what testimony would have been provided).

Because Howard has not established a reasonable probability that the outcome of his trial would have been different but for counsel's failure to refute dangerousness, this claim fails.

Lastly, Howard has not presented argument on several of the IATC claims remanded by the Ninth Circuit. Because it is petitioner's burden to demonstrate cause and prejudice to excuse a procedural default, those claims are forfeited. *See Bousley v. United States*, 523 U.S. 614, 622 (1998).

----

[5] Defense counsel remarked in closing:

> [The prosecutor] may suggest to you that, well, there's a possibility that he will receive executive clemency someday. When was the last time that you heard of a governor of this state granting executive clemency to an individual convicted of first degree murder and sentenced to prison for the rest of his life.

> We can put men on the moon. We can perform all kinds of super human feats. Certainly we can put Samuel Howard away for the rest of his life so that he does not harm members of society.

ECF No. 338-21, p. 26.

V.    CONCLUSION

For reasons set forth above, Howard is not entitled to relief on any of the twenty-nine claims remanded by the Ninth Circuit. Because this order, together with prior orders, completes the proceedings assigned on limited remand, this order is the "final order" for the purposes of the Ninth Circuit's limited remand order. *See* ECF No. 311, p. 2 ("Within 10 days after the district court enters its final order on limited remand, counsel for the parties shall file simultaneous status reports in this Court.").

**IT IS SO ORDERED.**

DATED this 28th day of May, 2019.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE